## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AKIN AKINLAWON,

        Plaintiff,

    v.

OVERHEAD DOOR CORPORATION,

        Defendant.

No. 4:17-CV-00218

(Judge Brann)

## MEMORANDUM OPINION

## SEPTEMBER 25, 2018

## I.    BACKGROUND

Plaintiff, Akin Akinlawon, hereinafter "Akinlawon," filed a complaint[1] and subsequently an amended complaint[2] alleging six-counts of employment discrimination against his former employer, Defendant Overhead Door Corporation, hereinafter "Overhead Door."   Count I is Race Discrimination in violation of Title VII of the Civil Rights Act of 1964,[3] hereinafter "Title VII." Count II is also Race Discrimination, but in violation of the Pennsylvania Human Relations Act,[4] hereinafter "PHRA."   Counts III and IV are National Origin Discrimination in violation of Title VII and the PHRA, respectively.   Count V is

---

[1]    February 6, 2017, ECF No. 1.

[2]    The amended complaint was filed the same day as the complaint, February 6, 2017, ECF No. 3.

[3]    42 U.S.C. §2000e *et seq.*

[4]    43 P.S. § 955.

Age Discrimination in violation of the Age Discrimination in Employment Act,[5] hereinafter "ADEA." Finally, Count VI is also Age Discrimination, but in violation of the PHRA.

Discovery has now closed and Overhead Door has filed a motion for summary judgment[6] requesting that the Court enter final judgment in its favor as to all counts of the amended complaint. The motion for summary judgment has been fully briefed.[7] Overhead Door also filed a motion to strike [Plaintiff's] Statement of Facts,[8] which is granted.[9] The motion for summary judgment is also granted for the reasons that follow.

---

[5] 29 U.S.C. § 623.

[6] April 9, 2018, ECF No. 21.

[7] Although the matter has been fully briefed, it is important to note for the record that Plaintiff only filed an opposing brief after prompting by the Court. The Defendant filed its motion for summary judgment and supporting brief contemporaneously on April 9, 2018. An opposing brief from Plaintiff was due May 1, 2018. None was filed. Thus, on May 16, 2018, the Court ordered Plaintiff to file an opposing brief by May 30, 2018, or risk the motion being deemed unopposed. Plaintiff then filed his opposing brief and statement of facts on May 30, 2018. As discussed in detail below, Plaintiff's statement of facts did not comply with the Middle District Local Rules.

[8] June 8, 2018, ECF No. 28.

[9] The Motion to Strike will be granted because Plaintiff's counter-statement of facts did not comply with Middle District Local Rule 56.1. The Rule directs Plaintiff to "respond to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried." *Id.* Plaintiff did not do so. Instead, Plaintiff drafted numbered paragraphs telling his own version of the alleged discrimination. The paragraphs in no way "respond" to the statement of facts set forth by the moving party, the Defendant. For the purposes of this motion, the Court deems admitted any facts not properly denied. *See U.S. ex rel. Paranich v. Sorgnard*, 286 F. Supp.2d 445, 447 n.3 (M.D.Pa. 2003) (admitting facts not properly denied under 56.1); *Nike, Inc. v. Eastern Ports Custom Brokers Inc.*, 2:11-cv-4390-CCC-MF, 2018 WL 3472628, at *1 (M.D.Pa. July 19, 2018) (admitting facts where responses stated that evidence "speaks for itself" or were otherwise not properly supported); *Hyland v. American General Life Companies, LLC.*, No. 06–6155 (AET), 2008 WL 4308219, at *1 n.1 (D.N.J. Sept. 17, 2008) (*citing Kautz v. Met–*

- 2 -

## II.    DISCUSSION

### A.    Standard of Review

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[10]   Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[12] "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[13] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[14]

---

*Pro Corp.*, 412 F.3d 463, 475 (3d Cir. 2005) (lack of personal knowledge or memory does not create a factual dispute)).

[10]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[11]    Fed. R. Civ. P. 56(a).

[12]    *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).

[13]    *Clark*, 9 F.3d at 326.

[14]    *Id.*

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[15] Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[16] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[17] "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[18] The evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the

---

[15] *Liberty Lobby, Inc.*, 477 U.S. at 252.

[16] *Id.*

[17] *Id.*

[18] *Id. (quoting Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

absence of a genuine issue of material fact."[19]  "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[20]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[21]  For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[22]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would

---

[19]  *Celotex*, 477 U.S. at 323 (internal quotations omitted).

[20]  *Id.*

[21]  *Liberty Lobby*, 477 U.S. at 250.

[22]  Fed. R. Civ. P. 56(c)(1).

contradict the facts identified by the movant.'"[23]  Moreover, "[i]f a party fails to

properly support an assertion of fact or fails to properly address another party's

assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion."[24]  On motion for summary judgment,

"[t]he court need consider only the cited materials, but it may consider other

materials in the record."[25]

"[A]t the summary judgment stage the judge's function is not himself to

weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial."[26]  "[T]here is no issue for trial unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party."[27]  "If the evidence is merely colorable . . . or is not significantly

probative, summary judgment may be granted."[28]

### B.    Undisputed Facts

Overhead Door manufactures residential and commercial garage doors and

accessories that are sold throughout the United States.[29]  Overhead Door has a

---

[23]  *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[24]  Fed. R. Civ. P. 56(e)(2).

[25]  Fed. R. Civ. P. 56(c)(3).

[26]  *Liberty Lobby*, 477 U.S. at 249.

[27]  *Id.*

[28]  *Id.* at 249–50 (internal citations omitted).

[29]  ECF No. 23 at ¶ 1.

business location in Williamsport, Pennsylvania.[30]  The Williamsport facility was not performing up to standard, so in October 2014 Overhead Door searched for a 'Lean/Six Sigma Champion' to improve that particular facility.[31]

A 'Lean/Six Sigma Champion' "is a managerial concept that focuses on the elimination of waste (*i.e.* defects, over-production, waiting, non-utilized talent, transportation, inventory, motion and extra-processing) and seeks to improve the quality of process outputs by identifying and removing the causes of defects and minimizing variability in processes."[32]  Prior to October 2014, Overhead Door had not employed a full-time Lean/Six Sigma Champion at its Williamsport facility.[33]

The person who would fill this role was intended to be second only to the Williamsport facility's plant manager.[34]  "Overhead Door expected, *inter alia*, that the new Lean/Six Sigma Champion would perform the following job responsibilities: (A) play a key role in the creation and lead the development of a centralized Continuous improvement office, (B) perform Gemba[35] walks for all supervisors and managers, (C) provide leadership and guidance in the Lean

---

[30]   *Id.* at ¶ 2.

[31]   *Id.* at ¶ 2-4.

[32]   *Id.* at ¶ 4.

[33]   *Id.* at ¶ 6.

[34]   *Id.* at ¶ 8.

[35]   According to Akinlawon's deposition testimony, "Gemba work involved going around – I'm just going to make it simple – going around in the morning, doing, like, three times a day, though – but just going around in the morning, you go to each department, each operator area and so on, see what issues they have, what problems they have, what gotten [sic] in the shift."  ECF No. 24-4 at 34.

transformation, (D) build and maintain detailed project schedules and drive the team on execution to plan, (E) manage the flow of information and communication across teams, and (F) work with team members to generate accurate development schedules."[36]

One of the individuals who applied for the position was Akinlawon.[37] Akinlawon is African American; he was born in Nigeria on August 12, 1953.[38] Akinlawon interviewed in person at the Williamsport facility with both Plant Manager Bryan Jones and Division Lean Manager Jason Peterson, hereinafter "Peterson."[39] During the face-to-face interviews, "it was apparent to Peterson that Akinlawon was an older black man, who was originally from a foreign country."[40] Peterson made the final hiring decision to hire Akinlawon.[41] He accepted the position on January 22, 2015.[42] During his tenure with Overhead Door, he was the only Lean/Six Sigma Champion that Peterson was supervising.[43]

Prior to his start date on February 16, 2015, Akinlawon was provided with Overhead Door's Salaried Employee Handbook, which he acknowledged

---

[36]  ECF No. 23 at ¶ at 7.

[37]  *Id.* at ¶ 9.

[38]  *Id.* at ¶ 12.

[39]  *Id.* at ¶ 10.  *See also* Akinlawon's deposition testimony, ECF no. 24-4 at 4.

[40]  ECF No. 23 at ¶ 13.

[41]  *Id.* at ¶ 14.

[42]  *Id.* at ¶ 16.

[43]  *Id.* at ¶ 66.

reading.[44] "Overhead Door's Salaried Employee Handbook includes an Equal

Employment Opportunity policy, a policy affirming the company's commitment to

diversity, a policy forbidding workplace harassment, as well as an Open Door

Policy/Problem Resolution Procedure."[45] After reading the handbook, Akinlawon

---

[44] *Id.* at ¶ 17, 19 and 22. *See also* Akinlawon Deposition, ECF No. 24-4 at 13-14.

[45] ECF No. 23 at ¶ 18. The Open Door Policy reads as follows:

**OPEN DOOR POLICY / PROBLEM RESOLUTION PROCEDURE**

Overhead Door encourages employees to communicate suggestions, opinions, concerns or complaints with your immediate supervisor, other members of your management team, or your human resources department. In most cases, the best possible solution to daily problems and issues is to solve them with an open and candid discussion with one or more member of your leadership team – starting with your immediate supervisor.

We encourage you also to use the Open Door to discuss more serious issues if you choose, or you can use the **Employee Hotline** by calling:

**Your**
**Overhead Door Employee Hotline**
**1.800.779.3998**

ECF No. 24-4 at 85.

The Open Door Procedure reads as follows:

Here are the steps you can take to use the **Open Door Procedure**.

**OPEN DOOR PROCEDURE**

You can contact:
1. Your immediate supervisor, and/or
2. Any member of your department or facility management team and/or
3. Your Human Resources Manager, and/or
4. Your next level of Supervision up to the Senior VP for your department or facility and/or
5. Your VP of Human Resources, and/or
6. Your Overhead Door Employee Hotline at 800.779.3998

ECF No. 24-4 at 86.

The Anonymous Means of Reporting reads as follows:

understood that he was to report concerns of discrimination pursuant to the handbook.[46]

As noted, Peterson was Akinlawon's direct supervisor.[47] Peterson was based in Nebraska.[48] "Peterson informed Akinlawon of the production concerns at the Williamsport facility and told Akinlawon that addressing these concerns was part of his goals and expectations."[49] "Akinlawon's sole responsibility was performing Lean and Six Sigma tasks."[50] He was employed by Overhead Door for approximately ten-months and "throughout Akinlawon's short employment with Overhead Door, Akinlawon struggled to meet expectations for his position as Lean/Six Sigma Champion."[51] Because he was not meeting expectations,

---

**Anonymous Means of Reporting**
Employees who have tried the Open Door procedure without satisfaction and /or they prefer to make the Company aware of an issue in a more confidential manner, the Company has a confidential ethics hotline managed by an independent third party.

> **Employees may reach the hotline at:**
> **1-800-779-3998**
> *It is available 24 hours day, seven days a week.*

ECF No. 24-4 at 89.

[46]   *Id.* at ¶ 21.  *See also* Akinlawon Deposition, ECF No. 24-4 at 15-17.

[47]   ECF No. 23 at ¶ 23.

[48]   Akinlawon Deposition, ECF No. 24-4 at 19.

[49]   ECF No. 23 at ¶ 25.

[50]   *Id.* at ¶ 24.

[51]   *Id.* at ¶ 26.

"Peterson met with Akinlawon regularly in hopes of guiding him through the steps he needed to take to perform the basic expectations of his job."[52]

However, five months after starting at Overhead Door, Akinlawon was not performing up to par. Therefore, on July 9, 2015 "Peterson and Human Resources Assistant Maggie Young, hereinafter "Young," presented Akinlawon with a Performance Improvement Plan" that identified nine steps[53] to improve his performance.[54] In addition, the July 9 Performance Improvement Plan stated:

> Since you began work for Overhead Door, we have discussed the need for you to be an influential leader for the plant. A leader that can identify gaps, determine game plans/action requirement, organize a team, and execute quick improvement while leveraging the importance of daily improvement on the shop floor.
>
> You are not meeting performance expectations in the following areas:
>
> • Leadership
> • Preparedness
> • Planning and Organization
> • Communication[55]

Akinlawon did not contest the Performance Improvement Plan through Overhead Door's Open Door Policy/Problem Resolution Procedure.[56]

---

[52]  *Id.* at ¶ 27.

[53]  These are, in short, start meetings on time, attend meetings on time, create a meeting tracker and report on each meeting, modify the 'Gemba' walks and be the leader in the discussion, lead efforts to be '16 MPM' by July 31, 2015, facilitate a 2 day '5s' event, organize a 'Kaizen schedule' with the team targeting one 'Kaizen' within the next 30 days, organizing '5 just do it' improvements, and call Peterson with twice weekly updates. ECF No. 24-1 at 9-10.

[54]  ECF No. 23 at ¶ 29 and 31.

[55]  *Id.* at ¶ 30.

On August 13, 2015, Peterson and Young met with Akinlawon to discuss his progress on the issues identified in the July 9 Performance Improvement Plan.[57] Peterson determined that Akinlawon had achieved six performance goals and failed at two; the final action was "postponed."[58]  "Peterson then provided Akinlawon with fifteen objectives that he was to complete by August 28, 2015."[59]

On August 15, 2015, Akinlawon sent Peterson a letter in response to the August 13 meeting.  That letter "does not state that Akinlawon believed that he

---

[56]  *Id.* at ¶ 32.

[57]  *Id.* at ¶ 33.

[58]  *Id.* at ¶ 34.  For example, Peterson wrote "Better job of being on time." "Was a couple days late but I do think the Gemba walks are better." "I am disappointed that on Tuesday when we spoke that you commented that you would make the conveyor line your priority. We have been talking about the conveyor line for months and I gave ample warning of what would happen if we did not complete the actions I mentioned when I was there the week of May 18th.  We are not meeting expectations here.  This is the most important thing you needed to be working on." "I have seen you take a little more active role in the Gemba walks. However, I needed you to drive the conveyor system actions and we aren't making the progress we need.  I often hear that someone else is blocking the progress but Leaders break down the barriers and convince others why it is important to get it done and then ensure that it happens."  "I am losing confidence in your ability to drive improvements, follow up, and ensure things are completed and sustained.  A couple of examples include not driving the windows flow sustainment, the 'stile' adhesive removal, the situation of the off stack storage area.  We spoke about all of those and none have been completed.  When the off stack gentleman told you yesterday that he gave the layout to you, you didn't even know what was going on with it…which must be nothing.  I left the metrics incomplete as I was hoping to see you follow up and ask me when they would be done.  All of these things are falling off the radar as they are not being managed.  At the 3:30 meeting yesterday, you told Bryan you would go remove the dead section that was sitting on top of the two good doors.  Do you know who moved the dead section at 5:30 last night?"  "I am concerned about the planning, organization, and follow up.  You had scheduled a Kaizen event and we didn't even know that the supervisor was going to be out of office.  If we were planning effectively, we would have known that.  When we had the off stack team meeting, you mentioned you wanted to wait another day so that you could talk to the supervisors.  When I came in Larry was wondering what was going on because you hadn't talked to him."  ECF No. 24-1 at 12-13.

[59]  ECF No. 23 at ¶ 36.

was being treated unfairly or discriminated against on the basis of his race, national origin, or age."[60]

On September 1, 2015, Peterson provided Akinlawon with feedback on the fifteen objectives discussed during the August 13, 2015 meeting.[61] "In Peterson's evaluation, four of the fifteen objectives were not completed, while one was only partially completed."[62] "Akinlawon did not contest Peterson's evaluation of his progress through Overhead Door's Open Door Policy/Problem Resolution Procedure."[63]

On September 24, 2015, Peterson presented Akinlawon with a Final Written Warning.[64] The Final Written Warning provided Peterson's updated assessment of

---

[60] *Id.* at ¶ 38-9. The letter explains the organizational system he has typically used, the explanations of certain meetings and events, and an offer to continually improve. ECF No. 24-4 at 102-106.

[61] ECF No. 23 at ¶ 40.

[62] *Id.* at ¶ 41. These are "1) Ensure that the windows area is cleared out and that they are flowing as we had worked on. 2) End caps and seal layout to be organized, 5S, and have a visual replenishment system installed. 3) Stabilize the processes for information on the panel line to prevent reruns (mainly the off stack). 4) Complete the match up area clean up and get the shortage and disposition boxes functioning. 5) Create and install the process where we are throwing away stiles because they have glue on them so we don't []. 6) Install the departmental metrics in track and aluminum. 7) Order all visual factory supplies as required by the ASD color code including the sign making machine. 8) Complete the standard work changes for off stack. 9) Complete the panel line information position standard work. 10) Get the departmental signs hung that I showed you the first week when you were here. 11) Get the stiles process lined up as we had discussed and ensure sustainment so they can flow the stile process []. 12) 5S the top seal area. 13) Fix the pads for the coils. 14) Get a small color desktop printer than can print 11x 17. 15) Repost all current standard work that his hanging on 11x17 sheets." ECF No. 24-1 at 15.

[63] ECF No. 23 at ¶ 42.

[64] *Id.* at ¶ 43.

Akinlawon's progress since the July 9, 2015 Performance Improvement Plan.[65]

Peterson noted that some of the areas identified as weaknesses that Akinlawon had

initially improved upon, had "regressed back to an unacceptable state."[66]

Specifically, Peterson wrote

> On 7/9/15 and 8/14/15 Jason Peterson met with you to review a Performance Improvement Plan. Both plans were put together to give you a clear understanding of our expectations within your position at Overhead Door. With those expectations, we expected a 100% effort to be made.
>
> As of 9/23/15, 50% of the listed objective have not been completed an another 14% have only been partially completed. This outcome is not an improvement in performance and we cannot accept this same level of performance going forward. Further objectives that are not clearly met by the deadlines given will result in further disciplinary action, up to and including termination.[67]

---

[65] *Id.* at ¶ 44.

[66] *Id.* at ¶ 45.

[67] ECF No. 24-1 at 17. For example, Peterson wrote, "Complete all objective that are given to you by your Supervisor by the deadline set. Due Date: Immediately. Take more initiative in your role at Overhead Door; don't wait to be assigned tasks. Due Date: Immediately. Objectives listed on the Performance Improvement Plans must all be 100% completed. Due Date: 10/9/15." Additionally, Peterson wrote, "Akin has been removed by Tom from leading the operational excellence meeting [be]cause he s[h]ows up late and is ill prepared." "Late to the Gemba walk today which he is supposed to lead. Late 3 mins to the operations cost down meeting yesterday." "Not all Akin's fault that this isn't meeting target and he seems incapable of identifying what needs to be done and leading it to completion." "Still hasn't had one [a 'Kaizen'] since he started." "Didn't drive any extended actions or analysis on conveyor system since 8/14 conversation." "The below action list for specific improvements required by Akin shows that he can't drive through and execute for his own tasks, concerns exist about his capability to manage mulitiple [sic] projects in a 200 team member facility." "Invited 4 team members for sign making training with a vendor and wasn't even prepared with the equipment setup." "Told me all the reasons why it was someone else's fault for the below items not being done today, which is almost a month after target." "5S is non existent. A small effort has been made in hanging signs but is incomplete and doesn't look world class. There isn't a visual replenishment system installed." This was followed with two pictures provided as examples:

The Final Written Warning provided Akinlawon two additional weeks, until October 9, 2015, to complete the objectives Peterson identified.[68] "Akinlawon did not contest Peterson's evaluation of his progress through Overhead Door's Open

  The next photos are not accompanied by an updated written status as of 9/23/15, but only a visual representation as to the July 9 plan of "Create and install the process where we are throwing away stiles because they have glue on them so we don't waste money."



"Track [metrics] ha[ve]n't been posted since the end of July." This was also accompanied by a photograph:



ECF No. 24-1 at 16-19.

---

[68]  ECF No. 23 at ¶ 50.

Door Policy/Problem Resolution Procedure."[69]  "In Peterson's opinion, Akinlawon did not accomplish the objectives by October 9, 2015."[70]

"[T]he decision was made to allow Akinlawon more time to accomplish the objectives Peterson had presented to him."[71]  However, "[b]y November 30, 2015, Akinlawon still had not progressed on the objectives with which he was presented in July and August."[72]  "On December 2, 2015, Human Resources Representative Cindy Panowicz[, hereinafter "Panowicz,"] and Young presented Akinlawon with a Final Performance Improvement Plan."[73]  Specifically, it stated:

> On 7/9/15 and 8/14/15 Jason Peterson met with you to review a Performance Improvement Plan.  Both plans were put together to give you a clear understanding of our expectations within your position at Overhead Door.  With those expectations, we expected a 100% effort to be made.  We have not seen an improvement in your overall performance.  Below we have outlined 6 specific targets that you will

---

[69]  *Id.* at ¶ 51.

[70]  *Id.* at ¶ 52.    Additionally, on October 10, 2015, Akinlawon sent the following email to Peterson: "I still have no luck today Saturday 10/10/2015 on getting (i) Maintenance to hang the signs, etc. – Steve said he will train a new employee on Monday on how to operate the Lift to do the job. (ii) Steve promised to get "the new glue" for the Pads on Coil Racks (iii) Janardhan to complete the Standard Works on 11 x 17. He has started updating the reviewed ones, to be ready for printing and laminating. (iv) Jeff B. didn't show up - He has all the materials for footprints kept and locked up. Thanks" ECF No. 24-3 at 18.    Peterson forwarded the email from Akinlawon to Human Resources, writing, "Cindy, Please pursue termination regarding the below failures to meet the performance timeline. The top 2 are somewhat out of his control but he can't organize the team to accomplish them. The bottom 2 he should of done himself. I expected him to do it but he only tells others to do it and they are incomplete. We have to get someone else in there. Thanks, Jason" *Id.*

[71]  ECF No. 23 at ¶ 53.

[72]  *Id.* at ¶ 54.

[73]  *Id.* at ¶ 55.

need to achieve within the next 30 days.  Failure to meet these specific targets can lead to termination of employment.[74]

"The Final Performance Improvement Plan set forth six specific targets Akinlawon needed to achieve in the next thirty days and explained that failure to do so could lead to termination."[75]  "Panowicz and Young also presented Akinlawon with the option of separating his employment and accepting a severance package."[76]  "Akinlawon did not respond to the Final Performance Improvement Plan or accept the severance package."[77]  "Overhead Door treated Akinlawon's failure to respond to either of the options Panowicz and Young presented to him as a resignation, effective December 14, 2015."[78]

After Akinlawon's tenure with Overhead Door ended, the company did not hire another Lean/Six Sigma Champion to replace him.[79]  Instead, a portion of

---

[74] ECF No. 24-2 at 7.

[75] ECF No. 23 at ¶ 56.  Specifically, these were "30 % scrap rate reduction.  Target December scrap rate of 8.90% Due Date: 12/31/15.  10% improvements of conveyor efficiency.  Target December sections per hour of 126.37.  Due Date 12/31/15.  15% improvement in window assembly.  Target December holes per labor hours of 7.53 holes.  Due date 12/31/15.  5s the top seal area (to include but not limited to) floor markings, cleaning, and sustaining the progress made.  Due Date 12/31/15.  Create visual replenishment system for the stiles area.  Due Date 12/31/15.  Update production room boards to look professional (using the same font, straighten, and sustain information).  Due Date 12/31/15."  ECF No. 24-2 at 7.

[76] ECF No. 23 at ¶ 57.

[77] *Id.* at ¶ 59.

[78] *Id.* at ¶ 60.  A letter was sent to Akinlawon confirming his termination and its effective date.  ECF no. 24-3 at 5-6.   The letter also offered severance pay, conditioned on Akinlawon signing a release form. *Id.*

[79] ECF No. 23 at ¶ 61.

Akinlawon's job responsibilities were assumed by the new plant manager, Eric Vitunac, who was 55 years old.[80]

Akinlawon testified that he never discussed with Peterson the fact that he was Nigerian.[81]  Akinlawon testified that it was clear that he is African-American.[82] Akinlawon was unable to identify any similarly situated employee who was treated more favorably than Akinlawon and who is outside of his protected class.[83]  Akinlawon acknowledged that Peterson never made comments about his race, age, or national origin.[84]  He testified that his claims rely on his "sens[ing]" it as "more than a gut feeling."[85]  He attested, "I strongly believe, yeah, if I had been of his race, he'd probably praise me to encourage me."[86]  When asked, "Do you believe it was because of your age, also?"[87]  Akinlawon replied, "It might be.  I don't know.  I think so, though.  I believe so."[88] When asked, "And do

---

[80]   *Id.* at ¶ 62-3.  "Vitunac was born on April 27, 1960." "Vitunac is 6 years and 8 months younger than Akinlawon."

[81]   Akinlawon deposition, ECF No. 24-4 at 6.

[82]   *Id.*

[83]   ECF No. 23 at ¶ 67. *See also* Akinlawon Deposition, ECF No. 24-4 at 22, and 32.

[84]   *Id.* at ¶ 68.

[85]   *Id.* at ¶ 69.

[86]   *Id.* at 24-4 at 38.

[87]   Akinlawon Deposition, ECF No. 24-4 at 38.

[88]   *Id.*

you believe it's because of your national origin, also?"[89]  Akinlawon replied, "I

believe so."[90]

Moreover, when asked "Did Mr. Peterson ever make any comments to you

about your race, age or national origin in making these decisions or acting this

way?"[91] Akinlawon replied, "Not directly.  And I don't think – I don't think any

right-thinking person would do that in the work environment, I mean, mention

such things, but you can actually – you actually sense it from people's behavior,

attitude and so on and how I got treated.  You might not know, anyway, but…"[92]

Later he testified, "Nobody ever said, Oh Akin, you are black, you are Nigerian, or

you are too old or a senior citizen, nobody ever said that to me."[93]  He also testified

that he did not believe that the Performance Improvement Plan was given to him

because of his race, but then later testified that "I believe this PIP (Performance

Improvement Plan) – because everything else I should read, why I was being

canceled, why this and that, is related to this.  So my race and origin and probably

age and whatever else has something to do with it."[94]

---

[89]  *Id.*

[90]  *Id.*

[91]  *Id.* at 40.

[92]  *Id.*

[93]  Akinlawon Deposition, ECF No. 24-4 at 41.

[94]  *Id.* at 48-9.

### C.    Analysis

#### 1.    Initial Matter

As an initial matter, I note that it appears that Akinlawon is no longer pursuing his age discrimination claims, found at Counts V and VI.  In a footnote in Plaintiff's now stricken counter-statement of material facts, he writes

> In the interest of judicial economy, as a means of narrowing the legal issues, Plaintiff is preceding herein only as to his claims of race and national origin-based discrimination.   Accordingly, the within statement of facts will be limited only to those that are relevant to the aforementioned claims.[95]

However, despite this opaque statement that Akinlawon relegated to a footnote, I will still proceed to address the age discrimination claims on their merits, along with the race and national origin claims.  Plaintiff's footnote was not clearly a dismissal of those claims.

#### 2.    Method of Analysis

Title VII prohibits employment practices that result in disparate treatment (intentional discrimination) if the practices are based in any way on race or national origin.[96]  Title VII states:

> It shall be an unlawful employment practice for an employer–
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

---

[95]    ECF No. 27 at 1 fn 1.

[96]    See 42 U.S.C. § 2000e-2.

(2) To limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.[97]

Akinlawon's "[c]laims under the PHRA are interpreted coextensively with Title VII claims."[98]

To succeed on his claims under Title VII or the ADEA, Akinlawon "may meet his or her burden by (1) presenting direct evidence of discrimination that meets the requirements of Justice [Sandra Day] O'Connor's concurring opinion in *Price Waterhouse v. Hopkins*[99], or (2) presenting indirect evidence of discrimination that satisfies the familiar three-step burden shifting framework identified in *McDonnell Douglas*."[100]

Here, there is no direct evidence of discrimination. As such, when a plaintiff's allegations of intentional discrimination are supported only by circumstantial evidence, a court must follow the well-established *McDonnell*

---

[97]  42 U.S.C. § 2000e-2(a).

[98]  *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006), *and see Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir.1996).

[99]  490 U.S. 228, 261 (1989).

[100]  *Monaco v. Am. Gen. Assur. Co.,* 359 F.3d 296, 300 (3d Cir.2004) (footnote omitted) (referring to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

*Douglas*[101] burden-shifting framework. "[T]he *McDonnell Douglas* analysis proceeds in three stages."[102]

> First, the plaintiff must establish a prima facie case of discrimination. [Next, i]f the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[103]

Although the elements of a *prima facie* case "depend on the facts of the particular case," a plaintiff in a Title VII discrimination case must generally demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered from some form of adverse employment action[104]; and (4) those actions were taken under circumstances that give rise to an inference of unlawful discrimination.[105]  In this analysis, the focus "is always whether the employer is treating 'some people less favorably than others because of their race,

---

[101]  411 U.S. 792, 802–804 (1973).

[102]  *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

[103]  *Id*, (quoting *McDonnell Douglas*, 411 U.S. at 802).

[104]  Although this element is not disputed for the purposes of this motion, I note that "An adverse employment action 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Cardenas v. Massey*, 269 F.3d 251, 267 n.10 (3d Cir. 2001).

[105]  *Id.* at 410-11.

color, religion, sex, or national origin.'"[106] Therefore, the plaintiff must produce "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII."[107] This determination is question of law to be made by the court.[108]

Similarly, under the ADEA, this prima facie case requires that "(1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive."[109]  "Where the plaintiff is not directly replaced, the fourth element is satisfied 'if the plaintiff can provide facts which if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'"[110]

### 3. Akinlawon has not set forth a prima facie case of discrimination

Although Overhead Door clearly stated in its brief, "Overhead Door does not dispute that Akinlawon satisfies the first three elements of his prima facie

---

[106] *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 352 (3d Cir. 1999) (*quoting Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

[107] *Iadimarco v. Runyon,* 190 F.3d 151, 161 (3d Cir. 1999).

[108] *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638 (3d Cir. 2015).

[109] *Id.*

[110] *Id.* (*citing Pivirotto, supra.*)

case,"[111] Akinlawon did not address in his opposing brief the sole contested element - the 'inference of discrimination.' Akinlawon's only argument in his brief as to establishing a prima facie case of discrimination is that he was qualified for the position – a wholly unnecessary argument, as this element is conceded by Defendant.[112]

Turning then to the only disputed factor, inference of discrimination, I note that Akinlawon's own testimony demonstrates that there is no inference of discrimination – neither based on race/national origin nor on age. Akinlawon testified that he never discussed his race nor national origin with Peterson.[113] He further testified that he never heard Peterson made a comment about his race, national origin, or age.[114] Strikingly, he testified that Peterson never made a comment about any of these impermissible factors; Akinlawon could only "sense it."[115]

Akinlawon was also unable to identify any similarly situated employee who was treated more favorably than him who was outside of his protected class.[116] He also testified that he did not believe his Performance Improvement Plans were

---

[111] Def. Br., ECF No. 22 at 6.

[112] *See* Pl. Br., ECF No. 26 at 6-7.

[113] ECF No. 24-4 at 6.

[114] ECF No. 24-4 at 68.

[115] ECF No. 24-4 at 41.

[116] ECF No. 24-4 at 22 and 32.

given to him based on any impermissible factors, but he "believed" that the impermissible factors "probably…had something to do with it."[117]  Moreover, Overhead Door did not hire another Lean/Six Sigma Champion to replace him – instead a portion of his job responsibilities were assumed by the new plant manager six years Akinlawon's junior.[118]

Akinlawon has not set forth any circumstances that give rise to an inference of discrimination based on his race or national origin.  Nor did he show any facts that are more likely than not based on his age.[119]

### 4.    Overhead Door has provide legitimate, non-discriminatory reasons for the adverse employment action

Even assuming *arguendo* that Akinlawon was successful in adducing a prima facie case of discrimination under Title VII or the ADEA, Overhead Door has nevertheless proffered legitimate non-discriminatory reasons for each of the alleged adverse employment actions.  At the outset, I note that a defendant's burden at this stage of the *McDonnell Douglas* framework is "'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable

---

[117]  ECF No. 24-4 at 48-9.

[118]  ECF No. 23 at 61-63.

[119]  Even assuming, *arguendo*, I had not stricken Plaintiff's statement of facts.  The only fact Akinlawon adds to the story here, is that Peterson interrupted Akinlawon during meetings. This, standing alone, does not set forth a prima facie case of discrimination.

employment decision.'"[120]  The employer's burden is satisfied by simply explaining its actions or producing evidence of a legitimate nondiscriminatory reason.[121]  This burden is merely one of production, not one of persuasion.[122]  Akinlawon made no argument in his brief as to this element of the *McDonnell Douglas* framework.[123]

Overhead Door provided Akinlawon with five formal, documented opportunities during his ten-month tenure to improve his performance prior to the final employment action.  Peterson and Young met with Akinlawon in-person and provided him with a detailed Performance Improvement Plan on July 9, 2015,[124] five months into his tenure with Overhead Door.  The Performance Improvement Plan set forth the four areas in which Akinlawon needed to improve and included nine clear action steps specific to his role as Lean/Six Sigma Champion in the Williamsport facility.[125]  Approximately one month later, on August 13, 2015, Peterson and Young again met Akinlawon in-person to discuss his progress on the issues identified in the July 9 plan.[126]  Peterson again provided feedback on the

---

[120] *Tomasso v. Boeing Co.,* 445 F.3d 702, 706 (3d Cir. 2006) (*citing Fuentes v. Perskie,* 32 F.3d 759 (3d Cir. 1994.)).

[121] *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 245, 255 (1981).

[122] *See id.* at 256-258.

[123] *See* Pl. Br., ECF No. 26.

[124] ECF No. 24-1 at 9-10.

[125] *Id.*

[126] ECF No. 24-1 at 12-13.

areas in which Akinlawon had improved, had failed, and then identified fifteen further goals to be met by the end of that month.[127]   On September 1, 2015, Peterson provided Akinlawon with feedback on the fifteen objectives discussed in the prior meeting, only four of which Akinlawon had completed.[128]

On September 24, 2015, Peterson provided a Final Written Warning and identified areas discussed in the July 9, 2015 meeting that had regressed back to an unacceptable state.[129]   On October 9, 2015, and again on November 30, 2015, Peterson found that Akinlawon still had not improved.[130]   Consequently, Akinlawon was provided with a Final Performance Improvement Plan on December 2, 2015 with six specific targets to meet over the next thirty days. Akinlawon was also given the option of separating from his employment and accepting a severance package.[131]

Because "the defendant need not prove that the articulated reason actually motivated its conduct" at this stage of litigation,[132] I find that Overhead Door has met its burden of production.

---

[127]   *Id.*

[128]   ECF No. 24-1 at 15.

[129]   ECF No. 24-1 at 17.

[130]   ECF No. 23 at ¶ 50, 51, 52, and 53.

[131]   ECF No. 23 at ¶ 53-57.

[132]   *Shellenberger v. Summit Bancorp, Inc.* 318 F.3d 183, 189 (3d Cir. 2003).

### 5. Akinlawon has not set forth evidence of pretext.

The burden therefore shifts back to Akinlawon to show, by a preponderance of the evidence, that Overhead Door's reasons are pretextual.[133] Most cases turn on this third step, i.e. whether plaintiff can establish pretext.[134] "At trial, the plaintiff must convince the finder of fact 'both that the reason was false, and that the discrimination was the real reason.'"[135] "Plaintiff cannot simply show that the employer's decision was wrong or mistaken. . .rather, the nonmoving plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence."[136] "Plaintiff also may survive summary judgment by pointing to evidence in the record which "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."[137]

Our Court of Appeals has explicitly instructed district courts who are disposing of a summary judgment motion in the employment discrimination setting as follows:

---

[133] *Willis* at 644.

[134] *Jones*, 198 F.3d at 410.

[135] *Id*. at 412-413 (*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

[136] *Fuentes v. Perskis*, 32 F.3d 759, 765 (3d Cir. 1994).

[137] *Jones,* 198 F.3d at 413 (*citing Fuent*es, 32 F.3d at 764)

[T]o defeat summary judgment when the defendant answers the plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. In other words, . . . a plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons. While this standard places a difficult burden on the plaintiff, it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decision-making by the private sector in economic affairs.[138]

---

[138] *Fuentes,* 32 F.3d at 764-5 (internal citations and quotations omitted) (emphasis in original).

Based on the above direction, this Court finds that the summary judgment record contains no evidence whatsoever, let alone by preponderance of the evidence, from which a reasonable jury could conclude that Overhead Door's stated reasons for Akinlawon's ultimate termination  was simply a pretext for discrimination.

Pretext is the only step of the *McDonnell Douglas* framework to which Akinlawon makes an argument in his brief opposing the motion.  Here, he argues that Overhead Door's proffered legitimate non-discriminatory reasons are, in fact, pretextual because he was offered a severance payment on termination.  He basis this argument on two non-binding District Court cases.

The first case cited by Plaintiff, *Staffieri v. Nw. Human Servs., Inc.,*[139] is distinguishable in several ways.  Plaintiff Staffieri had made multiple age discrimination complaints to his employer prior to his termination.[140]  He had been replaced by someone thirty years his junior.[141]  The *Staffieri* court denied summary judgment finding that Staffieri had set forth a prima facie case of age discrimination and despite the employer's proffered legitimate, non-discriminatory reasons for discrimination, Staffieri set forth sufficient circumstantial evidence of

---

[139] No. CIV.A. 12-1612, 2013 WL 2245639, at *1 (E.D. Pa. May 22, 2013) (Kelly, J.).

[140] *Id.* at *1.

[141] *Id.*

pretext because he had demonstrated that he was treated differently than similarly situated, younger employees.  Further, that court held that

> Plaintiff [Staffieri] cites to several inconsistencies that support pretext: the inability of the managers of Defendant to pinpoint the date which the decision was made to terminate Plaintiff's position; the complete lack of documentation prior to January 10, 2011, of the decision to terminate Plaintiff, especially in light of the size and sophistication of Defendant's operations; Plaintiff's testimony that Fastman told him shortly before his termination that he should not worry about being terminated because 'we need your position;' and, the decision to offer Plaintiff severance on the condition he waive any ADEA or FMLA claims even though this is not a company policy and according to Fastman had not been done during his time working for Defendant.[142]

Akinlawon has set forth none of the types of evidence available in *Staffieri*. He has only testified that he 'feels' he was discriminated against.  He was unable to identify any similarly situated employee who was treated differently.  During his tenure with Overhead Door, he was the only Lean/Six Sigma Champion that Peterson was supervising.[143]

Moreover, Akinlawon argues that because he was offered severance, that should be taken by the Court to evince some discriminatory animus.  But that is not the holding of *Staffieri*.  Severance was one of a number of factors where the *Staffieri* Court found evidence of pretext, after finding that Staffieri had also set forth a prima facie case of discrimination.  I have found no such prima facie case

---

[142] *Staffieri*, at *5.

[143] ECF No. 23 at ¶ 66.

here, and I reject Plaintiff's argument that an offer of severance, *standing alone*, is sufficient to find pretext.[144]

The other case cited by Akinlawon, *Didier v. Dow Jones Co.*,[145]does not support his proposition that a severance offer, without more, is evidence of pretext. In fact, *Didier* stands for the opposite proposition. That court stated, "even assuming arguendo that Plaintiff is correct—i.e., Defendant offered Plaintiff a severance package without her requesting one—Plaintiff still has failed to carry her burden of showing how this demonstrates that Defendant's articulated reasons are pretextual. Plaintiff points to no evidence that (i) proposed severance packages were inconsistent with any official or unofficial Dow Jones policy; or (ii) any ultimatum was attached to the specific severance package offered Plaintiff, e.g., that Plaintiff either accept the package or face discipline."[146] "Without such evidence, courts have rejected the argument that the offer of a severance package is sufficient to show pretext."[147]

---

[144] The Third Circuit, in a non-precedential opinion, has held similarly. *See Baker v. United Def. Indus., Inc.*, 403 F. App'x 751, 757 (3d Cir. 2010) (Scirica, J.) ("Second, even if Flannagan had told Baker in October 2004 that he could either expedite the situation by accepting a severance or have his performance scrutinized from that moment forward with subsequent transgressions theoretically to be marshaled against him at some future date, this alone does not imply that BAE lacked legitimate reasons to terminate Baker's employment.").

[145] No. CIV. 13-0176 FLW, 2014 WL 4094920, at *15 (D.N.J. Aug. 18, 2014)

[146] *Id.* at *15

[147] *Id. citing, e.g., Arenas v. L'Oreal USA Prods., Inc.*, 790 F.Supp.2d 230, 238–40 (D.N.J.2011) (rejecting a contention on summary judgment that severance package showed discriminatory animus where no evidence that package was offered for any reason other than to avoid

In the matter at hand, Akinlawon simply has not met his burden of pointing to any evidence in the record that demonstrates pretext. As such, there is no genuine issue of material fact to send to a jury and the only appropriate result in this action is dismissal pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## III. CONCLUSION

Akinlawon has failed to set forth a *prima facie* case of discrimination. He has also failed to set forth evidence for the factfinder to conclude that Overhead Door's thoroughly well documented, legitimate, non-discriminatory reasons should be discredited either circumstantially or directly. He has also failed to adduce any evidence that discrimination was more likely a motivation in the adverse employment action rather than the legitimate non-discriminatory reasons Overhead Door details.

The motion for summary judgment will be granted in its entirety, and final judgment entered in favor of Overhead Door. An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

laying-off older employees), *aff'd*, 461 F. App'x 131 (3d Cir.2012); *cf. Fenter v. Kraft Foods Global, Inc.*, Civ. No. 11–4916, 2012 WL 5586327 (E.D.Pa. Nov.14, 2012) (finding pretext not established where plaintiff offered no evidence to show that employer decision to not offer severance package was inconsistent with employer's policy).